UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

BRIAN EDWARD HUGHES, )
)
   Plaintiff, )
)
   v. ) Case No. 1:14-cv-00208-GWC
)
COMMISSIONER OF SOCIAL )
SECURITY, )
)
   Defendant. )

**OPINION AND ORDER**
**(Docs. 7, 8)**

Plaintiff Brian Hughes brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits. Pending before the court are the parties' motions for judgment on the pleadings. For the reasons stated below, the court DENIES Hughes's motion and GRANTS the Commissioner's motion. The decision of the Commissioner is AFFIRMED.

**I.   Background**

Brian Hughes was forty-five years old on his alleged disability onset date of September 30, 2010. (AR 147.) Hughes has a high school education and a bachelor's degree from a four-year college. (AR 169.) He owns his house, part of which he leases to a family. (AR 69.) From 1991 until March 2008, Hughes worked at a bank, first as a portfolio analyst and later as a vice president. (*Id.*) He lost this job after his employer merged with another company. (AR 74.) From February 2009 until September 2010, Hughes worked as a servicing manager at a mortgage collection company. (AR 169.) The record indicates he was discharged from this employment but is unclear on what grounds; however, according to Hughes he found it difficult to get along with his co-workers. (AR 262.)

1

Hughes protectively filed an application for Social Security disability insurance benefits on June 8, 2011, alleging that his "possible bipolar disorder" caused him to be unable to work. (AR 168.) At the time of his application Hughes had not yet sought psychiatric treatment. (AR 171.) On July 20, 2011, Hughes began treating with psychiatric nurse practitioner Carmella Greasley, who diagnosed him with anxiety disorder and depressive disorder. (AR 220.) Hughes was subsequently diagnosed with bipolar disorder and cannabis abuse (AR 269, 279.) After initially declining medication, Hughes began taking Gabapentin, Celexa, and Ativan to treat his mental conditions. (AR 221, 267.) He also used cannabis daily to help him sleep, although by the time of the administrative hearing he stated he had stopped using it because his medications helped him sleep. (AR 60, 259.)

On his function report, Hughes stated that he goes grocery shopping almost daily. (AR 178.) He also stated that he cooks for himself, cares for his pet cat, mows the lawn, cleans house, and does his laundry. (AR 177.) His hobbies include reading, watching television, and playing sports, although he stated that he only rarely plays sports. (AR 178.) Hughes also participates weekly as part of a team in an amateur competitive pool league. (AR 178.) He and his team competed in the national championship tournament in Las Vegas.[1] (AR 54.)

Hughes's application for disability insurance benefits was denied, and a hearing was held on September 28, 2012 before Administrative Law Judge ("ALJ") Donald McDougall. (AR 44-97.) Hughes appeared and testified, and was represented by an attorney. (AR 44.) A vocational expert ("VE") also testified at the hearing. (AR 75-85, 88.)

At the hearing, Hughes testified that he suffers from weekly migraines which are induced by bright lighting and noise and last all day, sometimes with vomiting. (AR 57, 87.) He also testified that although he attends weekly pool league matches, the team members are comprised mostly of his family who encourage him to get out of the house. He stated that he prefers keeping score to competing because of his anxiety. (AR 56, 68.) He also testified that he played pool at the national tournament in Las Vegas because league rules limiting the aggregate skill level of players competing on a team forced him to play or else his team would suffer in the competition. (AR 54.) He stated that during the Las Vegas competition an argument erupted

---

[1] The record does not provide the dates of the Las Vegas tournament. However, it was extensively discussed at the hearing and presumably occurred during the relevant time period.

2

with his opponent when Hughes would not allow him to use the restroom during a game. (AR 56.) Hughes further testified that he did not clean or keep up his house and that he could not routinely care for his personal hygiene on a daily basis. (AR 69.)

The ALJ issued an unfavorable decision on October 11, 2012. (AR 26-38.) The Appeals Council denied Hughes's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 1.) Hughes appealed to this court on March 26, 2014. (Doc. 1.)

## II.     The ALJ's Decision

"Disability" under the Social Security Act is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In evaluating disability claims the Commissioner uses a five-step procedure. *See Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). At step one the ALJ must determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, at step three the ALJ determines whether the severe impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984.)

If the claimant is not presumptively disabled, the ALJ must determine the claimant's residual functional capacity ("RFC"), which is the most the claimant can do in a work setting despite his limitations based on the relevant evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the ALJ considers whether the claimant's RFC precludes the performance of his past relevant work. 20 C.F.R. §§ 404.1520(f),

416.920(f). At the fifth and final step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proof in the first four steps; at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do." *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

The ALJ first determined that Hughes met the insured status requirements for disability benefits through December 31, 2015. (AR 28.) Employing the five-step procedure, the ALJ determined that Hughes had not engaged in any substantial gainful activity since his alleged disability onset date of September 30, 2010. (*Id.*) At step two, the ALJ found that Hughes's anxiety disorder was a severe impairment. (*Id.*) The ALJ concluded that Hughes's cannabis dependence and migraine headaches were non-severe. (AR 32.) At step three, the ALJ found that Hughes did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment in the Listings. (*Id.*)

The ALJ then found that:

> [Hughes] has the residual functional capacity to perform light work as defined by 20 C.F.R. § 404.1567(b), except this work must not involve: detailed or complex instructions; close concentration or attention to detail for extended periods of time; more than occasional contact with other people or the general public; job duties precluded by a mild limitation in learning new tasks or performing complex tasks with supervision; or a requirement to make decisions, set goals or deal with stress more than occasionally.

(AR 34.) The ALJ found that Hughes was unable to perform any of his past relevant work. (AR 36.) The ALJ then concluded based on Hughes's RFC and on the VE's testimony that there are other jobs in significant numbers in the national economy that Hughes could perform, including "cleaner/housekeeper" and "mailroom clerk." (AR 37.) Finally, the ALJ concluded that Hughes had not been under a disability from his alleged disability onset date through October 11, 2012, the date of his decision. (*Id.*)

### III.   Standard of Review

This court reviews "the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002); *see*

4

*also* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). "Substantial evidence is 'more than a mere scintilla'; it is 'such relevant evidence as a reasonable person might accept as adequate to support a conclusion.'" *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). The court should keep in mind "the fact that the Social Security Act is a remedial statute to be broadly construed and liberally applied." *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## IV.   Analysis and Conclusions

Hughes argues that the Appeals Council erred in discounting the opinion of his treating counselor. (Doc. 7-1 at 13-17.) Hughes argues that the ALJ erred at step two in failing to find his depression, bipolar disorder, migraine headaches, and insomnia to be severe impairments. (*Id.* at 21-22.) He also argues that the ALJ's RFC finding is internally inconsistent and not supported by substantial evidence. (*Id.* at 18-19.) Finally, he contends that the ALJ erred in failing to resolve a conflict between the Dictionary of Occupational Titles ("DOT") and the VE's testimony. (*Id.* at 19-21.)

### A.   Treating Source Opinion

Hughes treated with licensed clinical social worker Michael Schoenwetter from August 2011 through July 2012. (AR 277-314.) On February 22, 2013, Hughes submitted to the Appeals Council an opinion from Schoenwetter in the form of a "Mental Impairment Questionnaire." (AR 316-19.) The Appeals Council is required to consider any "new and material evidence related to the period on or before the date of the ALJ hearing decision" that a claimant submits to it. 20 C.F.R. § 404.970(b). The Appeals Council "will then review the case if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." *Id.*

In its January 27, 2014 denial of Hughes's request for review, the Appeals Council noted that it considered the additional evidence submitted by Hughes but that the evidence did "not provide a basis for changing the [ALJ's] decision." (AR 2.) Hughes argues that the Appeals

5

Council's failure to explain the weight it gave to Schoenwetter's opinion constitutes reversible error. However, "[t]he regulations do not require the Appeals Council to provide explicit written findings with respect to any new evidence and its impact in light of the overall record." *Moss v. Colvin*, No. 1:13-CV-731-GHW-MHD, 2014 WL 4631884, at *24 (S.D.N.Y. Sept. 16, 2014). The Appeals Council need only provide sufficient analysis for the "reviewing court to determine whether its decision is supported by substantial evidence." *Id.*

The regulations differentiate between treating sources who furnish opinions to the Commissioner. Medical opinions from acceptable medical sources are entitled to the treating physician rule, by which they are accorded controlling weight if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(c)(2). If the ALJ does not afford a treating physician's opinion controlling weight, he or she must explain why, taking into account the factors listed at 20 C.F.R. § 404.1527(c), including:

> (i) [T]he frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *see also Borsching v. Colvin*, No. 14-CV-6092L, 2015 WL 1868360, at *5 (W.D.N.Y. Apr. 23, 2015) ("The treating physician rule applies with equal force to the Appeals Council's consideration of new and material evidence . . . .").

By contrast, an "other" medical source, such as a licensed clinical social worker, cannot issue a "medical opinion," 20 C.F.R. § 404.1527(a)(2), and can only provide evidence of the severity of an impairment and how it affects a claimant's ability to function at work. *Id.* § 404.1513(d). An opinion from such a source is not entitled to the controlling weight accorded to medical opinions from acceptable medical sources. However, "other" medical sources, "such as . . . licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists." SSR 06-03p, 2006 WL 2329939, at *3. Accordingly, "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' . . . , are

important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* The same factors used in assessing weight accorded to medical opinions "can be applied to opinion evidence from 'other sources.'" *Id.* at *4.

Hughes argues that the Appeals Council's failure to engage with the factors listed above necessitates remand so that Schoenwetter's opinion can be considered appropriately. This argument is unpersuasive. While the Commissioner is encouraged to explain the listed factors in weighing opinions from "other" medical sources, nothing in the regulations requires her to do so. *See* SSR 06-03p, 2006 WL 2329939, at *6 (distinguishing between "what an adjudicator must *consider* and what the adjudicator must *explain*" and encouraging explanation of weight given to opinions from "other sources" "when such opinions may have an effect on the outcome of the case") (emphases added). For this reason, Hughes's reliance on *Stadler v. Barnhart*, 464 F. Supp. 2d 183 (W.D.N.Y. 2006), which remanded for a new hearing where the Appeals Council failed to follow the treating physician rule in discounting new evidence, is misplaced. As discussed above, the treating physician rule does not apply to non-medical opinions from "other" medical sources.

While the Appeals Council should have provided some insight into which factors it applied in evaluating Schoenwetter's opinion, any error in neglecting to do so is harmless. Schoenwetter opined that Hughes faced marked difficulties in maintaining social functioning. (AR 318.) He opined that Hughes faced only mild or no functional limitations otherwise. (*Id.*) He also anticipated that Hughes's impairments would "never" cause him to be absent from work. (AR 319.)

Taking into account Schoenwetter's opinion that Hughes faced marked difficulties in maintaining social functioning, the Appeals Council's conclusion that Schoenwetter's opinion did not provide cause to disturb the findings of the ALJ is supported by substantial evidence. The ALJ concluded that Hughes faced moderate difficulties in social functioning. (AR 33.) As the ALJ noted, Schoenwetter's treatment notes do not support an opinion that Hughes faced marked restrictions in social functioning, specifically because Schoenwetter continually assessed Hughes's Global Assessment of Functioning ("GAF") score at levels "reflecting only moderate

7

symptoms or moderate difficulty in functioning."[2] (AR 31, 278-314.) The ALJ also discussed Greasley's treatment notes indicating that Hughes was "'coping with overall anx/dep [sympoms] at present'" and that he attributed recent pool league victories to his medication. (AR 29, 281.) The ALJ discussed the opinion of Dr. Baskin, an agency examining psychologist, that Hughes's anxiety caused him only moderate limitations in relating with others. (AR 30, 226.) The ALJ noted that Hughes is able to interact with his tenant and with the general public well enough to grocery shop and "otherwise navigate the community and live independently." (AR 33.) He also cited Schoenwetter's treatment notes indicating that Hughes had "no problems with family and community." (AR 33, 299.) The record provides substantial evidence—including Schoenwetter's treatment notes—supporting the ALJ's finding that Hughes faced only moderate social functioning limitations and, by extension, the Appeals Council's determination that consideration of Schoenwetter's opinion did not upset the ALJ's findings. *See Rutkowski v. Astrue*, 368 F. App'x 226, 229 (2d Cir. 2010) (Summary Order) (concluding that county social services department report, submitted by claimant to Appeals Council, did "not add so much as to make the ALJ's decision contrary to the weight of the evidence").

## B. Step Two Analysis

Hughes argues that the ALJ erred at step two of the analysis in failing to find that Hughes's depression, bipolar disorder, migraine headaches, and insomnia were severe impairments. (Doc. 7-1 at 21-22.) A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The claimant bears the burden of establishing that an impairment is severe under the regulations. *See Poupore*, 566 F.3d at 306.

---

[2] The court briefly addresses the statement in the ALJ's decision that "any treating source statement supportive of a finding of disability would be inconsistent with the clear weight of the evidence." (AR 36.) Hughes argues that the statement suggests the ALJ was "predisposed to reject any evidence that is submitted" and that it constitutes legal error. (Doc. 7-1 at 17.) "[A]n administrative law judge is required to reach decisions by impartially applying the legal rules to the facts established by the record . . . ." *Kendrick v. Sullivan*, 784 F. Supp. 94, 102 (S.D.N.Y. 1992). The ALJ did not fail to do so here. The court finds that the challenged statement reflects the ALJ's opinion concerning the weight of evidence in the record indicating non-disability rather than a consideration of hypothetical evidence. The court concludes that this statement does not require remand.

8

The ALJ concluded that Hughes's migraines did not constitute a severe impairment, and the record supports the conclusion. In the medical record, Hughes first complained of migraines to psychiatric nurse practitioner Carmella Greasley on July 20, 2011. (AR 220.) Other than his complaint of migraines, she noted nothing else related to migraines except for the fact that Hughes had not seen a doctor in ten years and she encouraged him to do so. (AR 219-221.) On June 8, 2012, Hughes reported to Susan Spillman, D.O., that his migraines were "much improved" over the past three months since he began taking psychotropic medications. (AR 248.) Although Hughes testified that his migraines are triggered by light and sound (AR 57, 87), he was apparently able to continue working for years with his migraines and also continued to play pool in bars and pool halls during the relevant period, as the ALJ noted. (AR 32, 281, 283, 311.) The ALJ's determination that Hughes's migraines did not constitute a severe impairment is supported by substantial evidence.

Hughes argues that the ALJ erred in not finding his bipolar disorder to be a severe impairment because two treating sources, Greasley and Schoenwetter, eventually diagnosed him with it. (Doc. 7-1 at 21.) Schoenwetter also listed bipolar disorder as an impairment in his opinion. (AR 316.) However, only an "acceptable medical source" can provide evidence establishing a medically determinable impairment, and neither Greasley nor Schoenwetter are acceptable medical sources under the regulations. 20 C.F.R. § 404.1513(a). In addition, the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment is not, itself, sufficient to deem a condition severe." *Degraw v. Colvin*, No. 3:13-cv-782 (GLS), 2014 WL 3038279, at *1 (N.D.N.Y. July 3, 2014). Finally, the record provides substantial evidence that Hughes did not have a severe bipolar disorder impairment. Agency evaluating psychologist Renee Baskin, Ph.D., examined Hughes and did not diagnose him with bipolar disorder. (AR 225.) Agency consulting psychologist C. Butensky reviewed the record, including Hughes's complaints of "possible bipolar disorder," but likewise declined to diagnose him with it. (AR 228-240.) Taking into account Hughes's treating sources' diagnoses of bipolar disorder and Schoenwetter's opinion, substantial evidence remains to support the ALJ's step-two finding.

The ALJ's exclusion of depression as a severe impairment at step two is likewise supported by substantial evidence. While Greasley and Schoenwetter diagnosed Hughes with

depressive disorder (AR 220, 279), Hughes's symptoms, particularly his mood, improved with the use of pyschotropic medication. (AR 271, 273.) Moreover, Greasley continually assessed Hughes's GAF score at 64, which indicates only mild symptoms or some difficulty in social, occupational, or school situations. *Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 376-77 (4th ed., text revision, 2000) ("DSM-IV-TR")). Although Schoenwetter assessed Hughes's GAF score as 45 upon initial assessment, he subsequently assessed Hughes's GAF score at 55 or 60, indicating only moderate symptoms or difficulty in social functioning. *Id.* Additionally, upon examination Dr. Baskin observed that Hughes's mood was euthymic and he displayed a full range of affect. (AR 225.) She did not diagnose him with depressive disorder. While Dr. Butensky indicated that Hughes suffered from depressive disorder, he concluded that Hughes suffered from only mild functional limitations and had no severe psychiatric impairment. (AR 231, 238, 240.)

Finally, the ALJ's failure to recognize insomnia as a severe impairment is supported by substantial evidence. Although Hughes testified that he had had trouble sleeping, he also stated that his sleeping had much improved since he stopped using marijuana. (AR 60.) The medical record likewise indicates that Hughes's sleep improved with the cessation of marijuana use and with the use of psychotropic medication. (AR 248, 265, 273, 293.)

### C.  RFC Determination

Hughes next argues that his RFC as determined by the ALJ contains a "glaring contradiction" which renders it unsupportable, especially because the VE testified regarding a hypothetical that was likewise internally inconsistent. (Doc. 7-1 at 18-19.)

The ALJ found that Hughes had an RFC for certain work that "must not involve[] detailed or complex instructions" or "job duties precluded by a mild limitation in . . . performing complex tasks with supervision." (AR 34.) Hughes argues that the requirement that the work not involve complex instructions contradicts the finding that he has only a mild limitation in performing complex tasks with supervision. He asserts that if he "cannot do any work involving detailed or complex instructions, then he certainly would have more than a mild limitation in

10

performing complex tasks." (Doc. 7-1 at 18.) The Commissioner responds that the two findings are "not inherently contradictory." (Doc. 8-1 at 25.)

The court agrees with the Commissioner that "[i]nstructions and tasks are not the same. Complex tasks done with supervision may be broken down into simple instructions." (*Id.*) An RFC's requirement that a claimant be shielded from complex instructions does not preclude a finding that the claimant faces only a mild limitation in performing complex tasks with the benefit of supervision. "[I]t is certainly possible for someone to be capable of [performing complex tasks with supervision] but, at the same time, to benefit from [work avoiding complex instructions]." *Sink v. Colvin*, No. 1:12-cv-00239 (JJM)(MAT), 2015 WL 3604655, at *20 (W.D.N.Y. June 8, 2015) (concluding RFC finding that claimant could "interact appropriately with co-workers" and was restricted to occasional interaction with co-workers was not internally inconsistent). The ALJ's RFC determination is not internally inconsistent, and it was not error for him to submit it as a hypothetical RFC to the VE.

### D. VE Testimony

Finally, Hughes argues that the ALJ failed to reconcile a conflict between the VE's testimony and the DOT. Hughes points to the VE's testimony that an individual with a hypothetical RFC identical to his could perform the work of a data entry clerk. (AR 78-79.) The VE neglected to provide a DOT code for the data entry clerk position, and Hughes identifies three contenders in the DOT. (Doc. 7-1 at 19.) Hughes asserts that "it is not possible to ascertain [whether he] could perform any of these three data entry jobs . . . because the VE did not specif[y] which one (if any) he was considering." (*Id.* at 20.)

> Social Security Ruling 00-4p instructs:
>
> When vocational evidence provided by a VE or VS is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict. The adjudicator must explain the resolution of the conflict irrespective of how the conflict was identified.

SSR 00-4p, 2000 WL 1898704, at *4. Here the VE did not provide evidence inconsistent with the DOT; rather, he gave insufficient information from which one could locate the position he cited in the DOT. Additionally, "[t]he ALJ is not required to rely on classifications in the DOT

11

and may instead rely on a VE's testimony, even if it is inconsistent." *Ramos v. Astrue*, No. 09CV0090, 2010 WL 2854450, at *5 (W.D.N.Y. July 19, 2010). Therefore, granting Hughes the assumption that there was a conflict between the VE's testimony and the DOT, failing to resolve it was harmless error. *See Reynolds v. Comm'r of Soc. Sec.*, No. 1:11-cv-00778 NPM, 2012 WL 2050410, at *6 (N.D.N.Y. June 6, 2012) (holding that any conflict between the DOT and VE's testimony was harmless error considering that ALJ may rely on VE testimony in spite of information in DOT).

Hughes also argues that the reasoning levels required by the jobs cited by the VE are inconsistent with his RFC and with the hypothetical presented to the VE. While Hughes's RFC forecloses work that involves "detailed or complex instructions," a reasoning level of 2 requires the ability to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions." (*Id.* (citing Appendix C to the DOT, at 3)) Hughes therefore asserts that the ALJ's RFC limits him to jobs which the DOT assigns a reasoning level under that of 2. (Doc. 7-1 at 20.) Meanwhile, the VE stated that a hypothetical individual with Hughes's RFC could perform the jobs of mailroom clerk and housekeeper in addition to data entry clerk. (AR 78.) Hughes argues that all of these jobs require reasoning abilities of level 2 or higher.

However, Hughes conceded in his response to the Commissioner's motion that housekeeping requires only level 1 reasoning abilities. (Doc. 9 at 5.) Therefore, even accepting Hughes's argument that the ALJ's RFC determination precludes him from performing jobs that the DOT assigns a reasoning level of 2, *cf. Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) ("DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range."), any error is harmless because the ALJ cited at least one job Hughes could perform, which is sufficient to meet the Commissioner's step-five burden. *See* 20 C.F.R. § 404.1566(b) ("Work exists in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications."); *see also McCusker v. Comm'r of Soc. Sec.*, No. 1:13-cv-1074 (GLS), 2014 WL 6610025, at *3 (N.D.N.Y. Nov. 20, 2014) (concluding that VE's testimony that one job existed in the national and regional economy that claimant could perform was sufficient to meet Commissioner's step-five burden).

12

## V. Conclusion

For the reasons stated above, Hughes's motion for judgment on the pleadings is DENIED, and the Commissioner's motion is GRANTED. The decision of the Commissioner is AFFIRMED.

Dated this 21st day of July, 2015.

                                                                            Geoffrey W. Crawford, Judge
                                                                            United States District Court